**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

DEBRA ALSTORK,  :

          Plaintiff,                    Case No. 3:07-cv-303

    -vs-

                                     Chief Magistrate Judge Michael R. Merz

AIG LIFE INSURANCE CO.,
    *et al.*,

          Defendants.  :

**DECISION AND ENTRY**

This case is before the Court on Plaintiff's Motion for Judgment on the Administrative Record, (Doc. 16), and Defendant's Motion for Judgment on the Administrative Record. (Doc. 17). The parties have fully briefed the issues, (Doc. 16, 17, 18, 19), and the matter is ripe for decision on the merits.

The parties have consented to plenary magistrate judge jurisdiction pursuant 28 U.S.C. § 636(c) and the matter has been referred on that basis. (Doc. 8).

Ms. Alstork filed this action against Defendants AIG Life Insurance Company (AIG), National Union Fire Insurance Company of Pittsburgh, PA, (National Union) and ABX Air, Inc. (ABX) in the Common Pleas Court of Montgomery County, Ohio essentially alleging that Defendants improperly denied her the right to benefits in the amount of One Hundred Thousand Dollars ($100,000) under a life insurance policy which had been issued on the life of her son Darryl

Roberts, Jr.  (Doc. 1, Attachment 1 thereto; Doc. 3).  Defendants removed the matter to this Court on the basis that the claim comes under the Employee Retirement Insurance Security Act, 29 U.S.C. § 1001, *et seq.*  (Doc. 1).  The Court's subject matter jurisdiction is not disputed.

The parties generally agree to the facts which are gleaned from the administrative record. (Doc. 15).

Ms. Alstork is the mother of the decedent Darryl Roberts. Administrative Record (AR) at 121.  Mr. Roberts was employed part-time by ABX and participated in an employee benefit plan which included the life insurance policy (Policy) issued by AIG which is the Policy at issue in this case. AR at 125, 131. The Policy provides for $100,000 payment in the event of an accidental death, AR at  125, and Ms. Alstork is the beneficiary of the policy. AR at 121.  It is not clear what National Union's role is in this matter although there is an indication that it may have underwritten the Policy.  See AR at 119.

The Summary Plan Description (Plan) reads in part that: "Voluntary Accident Insurance does not cover any loss caused by or resulting from ...[d]isease of any kind; hernia of any kind; or bacterial infections, except pyogenic infections, which occur through an accidental cut or wound." Administrative Record (AR) at 281.  The Plan also provides:

> **Definitions**
> ...
> **Injury.**  Bodily injury caused by an accident occuring while the Voluntary Accident Insurance policy is in force as to the Insured Person and resulting directly and independently of all other causes in loss covered by the insurance policy.
> ...

AR at 284.

The Group Accident Insurance Policy (Policy) reads in part:

**INJURY DEFINITION AND EXCLUSIONS AMENDATORY ENDORSEMENT**

... effective August 15, 2004...

**Injury**–means bodily injury: (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's coverage under this Policy is in force, and (2) which directly (independent of sickness, disease, mental incapacity, bodily infirmity or any other cause) causes a covered loss.

**Exclusions**

No coverage shall be provided under this Policy and no payment shall be made for any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of any of the following excluded risks even if the proximate or precipitating cause of the loss is an accidental bodily injury.
...
2. sickness, or disease, mental incapacity or bodily infirmity whether the loss results directly or indirectly from any of these.
...
11. stroke or cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack; coronary thrombosis; aneurysm.

AR at 149-50.

On May 6, 2006, at about 8:54 a.m., Mr. Roberts was involved in a single-vehicle accident in which the vehicle he was driving went off the road and collided with a pole. AR at 101-105. Trotwood police officer M. Vance witnessed the event and completed a Traffic Crash Report. AR at 99-105. Officer Vance reported seeing Mr. Roberts' vehicle leave the westbound lane and strike a utility pole on the eastbound side of the road. *Id.* Officer Vance radioed dispatch to report the incident and request a medic. *Id.* Emergency medical personnel arrived on the scene at approximately 9:02 a.m. and they determined that Mr. Roberts died at 9:07 a.m. *Id.*

Dr. Kent Harshbarger, a deputy coroner for Montgomery County, Ohio, performed

a postmortem examination of Mr. Roberts' body on May 6, 2006, and the toxicology laboratory report was completed on May 30, 2006. AR at 108-114. On May 24, 2006, Ms. Alstork filed a claim for benefits under the policy of insurance. AR at 119, 126-127.

Dr. Harshbarger issued his report on June 6, 2006. AR at 108-113. In that report, Dr. Harshbarger noted that Mr. Roberts had heart disease which was reflected by cardiomegaly with a heart weight of 420 grams, a hypertrophied right ventricle, surgical therapy for congenital heart disease with large ventral septal defect and apparent transposition of the great vessels, and moderate pulmonary edema and congestion. AR at 108. Dr. Harshbarger also noted that Mr. Roberts had contusions and abrasions of his head, chest, and extremities with approximately 100 ml. of blood in his abdomen, and a left mid to distal femur fracture. *Id.* Dr. Harshbarger opined that the cause of Mr. Roberts' death was "cardiac arrhythmia due to congenital heart disease" and that his death was contributed to by blunt force injuries of the head, abdomen, and left thigh. *Id*. The toxicology report was negative for alcohol and drugs of abuse although positive for caffeine. AR at 114. Mr. Roberts' death certificate, filed June 12, 2006, identified the immediate cause of death as cardiac arrhythmia due to a consequence of congenital heart disease with blunt force injuries of the head, abdomen, and left thigh contributing to his death. AR at 115.

On June 16, 2006, Ms. Alstork provided AIG with documentation it had requested including copies of the police report, Dr. Harshbarger's report, and Mr. Roberts' death certificate. AR at 98.

On June 22, 2006, AIG asked Dr. Joye Carter, a forensic pathologist, to review the matter and render an opinion as to the accidental death claim. AR at 94. Specifically, AIG asked Dr. Carter to answer two (2) questions: (1) "[w]as the result/cause of [Mr. Roberts'] death the motor

4

vehicle accident or was the result/cause of his death due to other significant conditions?" and (2) "[w]hich exclusions, if any, in the policy and Summary Plan Description pertain to the insured's loss?" *Id.*

On July 14, 2006, Dr. Carter issued her report. AR at 65-67. Dr. Carter noted that she had reviewed, *inter alia,* the police report with narrative and photographs, Dr. Harshbarger's report, the toxicology report, the preliminary and final death certificates, the insurance policy, and the Plan. *Id.* Dr. Carter concluded, *inter alia*,

> [T]his death was the result of significant cardiac disease which pre-existed the blunt trauma from the vehicular impact. There was no evidence of injury to the brain or neck organs and no physical injury to explain the rapid death of Mr. Roberts at the scene. ... [T]he injuries received from the collision with the utility pole were insufficient to have caused his rapid demise ... .
>
> In answer to the question of causation, this death was not the direct or independent result of the auto accident but a combination, most likely related to the underlying cardiac disease. The applicable exclusions to the Summary Plan Description and policy information would be paragraph 2 on the list of exclusions in the AIG Life Policy brochure which states that sickness, disease or infections of any kind[] would not be covered and on page 153 of the Voluntary Accident Insurance Plan which states that disease of any kind would not be covered.

*Id.* In reaching her conclusions, Dr. Carter noted that a law enforcement officer witnessed Mr. Roberts' vehicle leaving the roadway prior to the impact suggesting that something was wrong before the impact, that there was minimal blood present, that the postmortem examination revealed that Mr. Roberts sustained minimal injuries, and that the postmortem examination also revealed that Mr. Roberts' heart ventricles were thickened. *Id.*

AIG's file activity report reflects a claims examiner's entry dated July 20, 2006, which indicates that she recommended Ms. Alstork's claim for payment. AR at 5. However, that

5

same entry appears to have been overwritten changing "July 20" to "July 24" and changing "payment" to "denial". *Id.* In a letter dated July 24, 2006, AIG notified Ms. Alstork that it was still investigating her claim. AR at 61. AIG notified Ms. Alstork on September 18, 2006, that it was denying her claim essentially on the basis that Mr. Roberts' death "was not a direct result of an unintended, unanticipated accident that occurred directly and independent of all other causes as required by the Policy." AR at 54-56.

On November 15, 2006, Ms. Alstork, through counsel, appealed AIG's decision denying her claim. AR at 46-49. In support of her appeal, Ms. Alstork submitted a November 1, 2006, report from Dr. Terrence Dillon, who had been Mr. Roberts' treating cardiologist since shortly after Mr. Roberts' birth. AR at 50. Dr. Dillon reported that Mr. Roberts was born with complex cyanotic congenital heart disease in the form of double outlet right ventricle with severe valvar and infundibular pulmonic stenosis, d-transposition of the great vessels, and a large noncommitted ventricular septal defect. *Id.* Dr. Dillon also reviewed Mr. Roberts' cardiac-related history which included four (4) cardiac surgeries over the first 8 ½ years of life. Dr. Dillon noted that Mr. Roberts' growth and development had been entirely normal, that he was entirely asymptomatic, and that a November, 2005, episode of upper back pain was not cardiac-related. *Id.* Dr. Dillon also noted that at no time did Mr. Roberts have any symptomatology or electrocardiographic findings to suggest a serious rhythm disorder. *Id.* Dr. Dillon stated that,

> [He was] somewhat at a loss as to why his immediate cause of death was thought to be secondary to a cardiac arrhythmia unless this is simply a diagnosis of exclusion, especially since the postmortem examination failed to demonstrate any significant trauma to the cardiopulmonary system, but did demonstrate blunt force injuries to the head, abdomen and left thigh. In addition, the postmortem examination ruled out a myocardial infarction and pulmonary embolism as the etiology for his demise.

> In summary, [Mr. Roberts] had been extremely stable for many years and had not shown any evidence for deterioration or a serious rhythm disturbance. ...

*Id.*

In response to Mr. Alstork's request, on December 5, 2006, AIG acknowledged receipt of Ms. Alstork's appeal and it provided her counsel with a copy of the Summary Plan Description, a copy of the Policy, and a copy of the complete administrative record. AR at 41. In addition, AIG sought a coverage opinion from its counsel. AR at 43. After obtaining that opinion, AR at 21-40, AIG advised Ms. Alstork that it would present her appeal to its ERISA Appeals Counsel. AR at 17. By way of a letter to her counsel dated April 19, 2007, AIG notified Ms. Alstork that its ERISA Appeals Committee had decided to uphold the September 18, 2006, denial of her claim. AR at 9-14. AIG explained that while it had considered Dr. Dillon's letter, it had denied the claim on the bases of Drs. Harshbarger's and Carter's reports as well as its counsel's legal opinion. *Id.* AIG also explained that

> The Committee reviewed the entire administrative record of this claim and concluded that it contains substantial evidence Darryl Roberts' death was not a direct result of an unintended, unanticipated accident that occurred directly and independent of all other causes, as required by the Policy definition of injury. In addition, the Policy specifically excludes any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of sickness, disease, mental incapacity or bodily infirmity whether the loss results directly or indirectly from any of these and stroke or cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack; coronary thrombosis; aneurysm.

*Id.* After AIG notified Ms. Alstork that it was denying her claim, she filed the present action.

ERISA comprehensively regulates employee benefit plans. 29 U.S.C. §§ 1002, 1003. It regulates benefit plans to ensure the uniformity of decision which will assist plan administrators,

7

fiduciaries, and participants to predict the legality of proposed actions without the necessity of reference to varying state laws. *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 56 (1987).

In his concurring opinion in *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609 (6th Cir. 1998), which became the Court's opinion on the issue his opinion addressed, Judge Gilman ascertained that the methods used by district courts in adjudicating proceedings under 29 U.S.C. §1132(a)(1)(B), to wit: bench trials on the merits under Fed.R.Civ.P. 52 and summary judgment procedures set forth in Fed.R.Civ.P. 56, are both inconsistent with the appropriate standard of review set forth by the Court in *Perry v. Simplicity Engineering,* 900 F.2d 963 (6th Cir. 1990). *Wilkins,* 150 F.3d at 617-18. Accordingly, the Court established a set of guidelines to replace summary judgment procedures for district courts to use in adjudicating ERISA recovery of benefits actions. *Id.* at 619. As to the merits of the claim, the *Wilkins* court instructed district courts to conduct a review based solely on the administrative record and render findings of fact and conclusions of law accordingly. *Id.* In doing so, the court may consider the parties' arguments concerning the proper analysis of the evidence contained in the administrative record but it may not admit or consider any evidence not presented to the administrator except where there is a procedural challenge to the administrator's decision such as an alleged lack of due process afforded by the administrator or alleged bias on its part. *Id.*

It is by now well-established that courts review challenges to ERISA benefit determinations under the *de novo* standard unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *University Hospitals of Cleveland v. Emerson Electric Co.,* 202 F.3d 839, 844 (6th Cir. 2000), *citing, Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where an ERISA plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the plan administrator's decision to deny benefits is reviewed under the deferential arbitrary and capricious standard of review. *Shields v. Readers Digest Association, Inc.*, 331 F.3d 536 (6th Cir. 2003), *citing, Firestone, supra.* Under the deferential "arbitrary and capricious" standard, a court will uphold a benefit determination if it is "rational in light of the plan's provisions." *University Hospitals,* 202 F.3d at 846. The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir. 2003). Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious. *University Hospitals, supra.* (citation omitted).

A party who is not a plan administrator is not a proper defendant in an ERISA action. See *Daniel v. Eaton Corporation,* 839 F.2d 263, 266 (6th Cir.), *cert. denied,* 488 U.S. 826 (1988); see also*, Kmatz v. Metropolitan Life Ins. Co.,* 458 F.Supp.2d 553 (S.D. Ohio 2005). Unless the employer is shown to control administration of the Plan, it is not a proper party in an ERISA action. *Gore v. ElPaso Energy Corp. Long Term Disability Plan,* 477 F.3d 833, 842 (6th Cir. 2007).

As an initial matter, this Court notes that AIG is the administrator of the Plan at issue. Because neither ABX or National Union administered the Plan, neither is a proper party defendant in this action. Accordingly, ABX and National Union are entitled to judgment on all claims against them.

Next, the Court notes that the Plan provides that: "[t]he Plan Administrator has the sole discretionary authority to determine eligibility for benefits and to construe the terms of eligibility for the disability, life and accident plans." AR at 124. The Court concludes, and the

parties agree, that because the Plan provides the administrator the sole discretionary authority to determine eligibility for benefits, the Court should apply the highly deferential "arbitrary and capricious" standard of review.

Ms. Alstork first argues that AIG's decision denying her claim was arbitrary and capricious because the Plan and the Policy conflict with respect to the definition of "injury".

As noted above, both the Plan and the Policy define "injury". Where a summary plan description and an underlying plan policy contain conflicting language, the summary plan description controls. *Edwards v. State Farm Mut. Auto. Ins., Co.,* 851 F.2d 134, 136 (6th Cir. 1988); *Auto Owners Ins. Co. v. Thorn Apple Valley, Inc.,* 31 F.3d 371, 374 (6th Cir. 1994), *cert. denied,* 513 U.S. 1184 (1995). Assuming that there is a conflict between the Plan and the Policy as to the definition of "injury", the applicable definition is the one which the Plan contains. Indeed, the parties seem to agree that the Plan's language is the applicable language. See, Doc. 16 at 8-9; Doc. 17 at 11. However, contrary to Ms. Alstork's position, a conflict between the Plan and the Policy does not provide a basis for concluding that AIG's decision was arbitrary and capricious.

Ms. Alstork argues next that the fact that AIG is a conflicted decision-maker compels the conclusion that its decision was arbitrary and capricious.

As this Court previously noted in its April 7, 2008, Decision and Entry denying Ms. Alstork's Motion to Approve Discovery Plan:

> Where an entity both administers a plan and pays claims under the plan, this situation *may* result in a conflict of interest. *Osborne v. Hartford Life and Accident Insurance Co.,* 465 F.3d 296, 300 (6th Cir. 2006)(emphasis supplied). This dual relationship is simply one factor that courts are to consider under the arbitrary and capricious standard of review where there is significant evidence that the insurer was motivated by self-interest. *Peruzzi v. Summa Medical Plan,* 137 F.3d 431, 433 (6th Cir. 1998). For example, in a disability matter, a

10

> plaintiff could present statistical evidence to suggest that, when retained by the administrator, a physician reviewer has consistently opined that claimants are not disabled. *See, Ray,* 2007 WL 127983 at *3, *citing, Kalish v. Liberty Mutual/Liberty Life Assurance Co.,* 419 F.3d 501 (6th Cir.). Or, a plaintiff might present evidence that the same consultant has expressed an opinion adverse to a claimant in a large number of cases within a short period of time, as evidenced by, for example, court decisions involving those benefit denials. *See, Ray, supra.*

*(*Decision and Order, Doc. 13).

This Court's previous analysis and conclusion on the conflict of interest issue is further supported by additional Sixth Circuit law. For example, *Cooper v. Life Ins. Co. of North America,* 486 F.3d 157 (6th Cir. 2007), holds that where a plan authorizes an administrator both to decide whether an employee is eligible for benefits and to pay those benefits, it creates a potential conflict of interest. *Id.* at 165, citing *Glenn v. Metro Life Ins. co.,* 461 F.3d 660, 666 (6th Cir. 2006). *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005), provides that his possible conflict should be taken into account when deciding whether the plan administrator's decision is arbitrary and capricious. *Id.* at 292. In addition, *Calvert* provides that the standard of review is not altered when the administrator is operating under a conflict of interest. *Id.* at 293. Instead, the standard remains the same and the conflict of interest is to be considered in *applying* that standard. *Id.* (emphasis in original). In other words, an alleged conflict of interest is a factor that the court must take into consideration in determining whether the administrator's decision was arbitrary and capricious. Further, and as this Court has previously noted, a plaintiff is required to show not only the purported conflict of interest but also to provide significant evidence that the conflict actually affected or motivated the decision at issue. *Cooper,* 486 F.3d at 165, citing *Peruzzi v. Summa Med. Plan,* 137 F.3d 431, 433 (6th Cir. 1998).

11

As in *Cooper,* Ms. Alstork has provided no evidence, nor pointed to any in the administrative record, that AIG's denial of her claim was motivated by its alleged conflict of interest. Ms. Alstork simply asserts that because AIG both decides whether an claim should be paid and then pays that claim, it necessarily has a conflict. In addition, Ms. Alstork makes the conclusory assertion, without more, that Dr. Carter, the pathologist with whom AIG consulted, was biased simply because AIG retained her to review the matter.

Contrary to Ms. Alstork's argument, AIG's potential conflict of interest does not automatically require a finding that its decision denying her application was arbitrary and capricious. Rather, the potential conflict is a factor this Court considers in reviewing AIG's decision.

Ms. Alstork also argues that AIG's decision denying her claim was arbitrary and capricious because it did not give any consideration to Dr. Dillon's report. However, a review of the administrative record does not support Ms. Alstork's position.

As note above, in support of her appeal of AIG's denial of her claim, Ms. Alstork submitted to AIG on November 15, 2006, a November 1, 2006, report from Dr. Dillon who was Mr. Roberts' treating cardiologist since shortly after his birth. AR at 46-49, 50. A February 6, 2007, memorandum summarizing AIG's ERISA Appeal process demonstrates that during that appeal, AIG considered, *inter alia,* Dr. Dillon's report:

> The claimant's attorney submitted a letter from Dr. Terrance Dillon, M.D., a pediatric cardiology specialist. Dr. Dillon has been involved with Mr. Roberts' care since his initial consultation shortly after his birth. Dr. Dillon indicated that he performed a cardiac catheterization on Mr. Roberts's [sic] 2nd day of life at Children's Medical Center with the study demonstrating complex cyanotic congenital heart disease in the form of double outlet right ventricle with severe valvar and infundibular pulmonic stenosis, d-transportation of the great vessels, and a large noncommited ventricular septal defect. Dr. Dillon indicated that Mr. Roberts' [sic] subsequently underwent four

>cardiac operations over the next 8 ½ years.  Dr. Dillon stated over
>then next ten years Mr. Roberts was seen on a yearly basis and was
>entirely asymptomatic.

AR at 12-14.  In addition, on April 19, 2007, when AIG advised Ms. Alstork that it had denied her appeal and affirmed its denial of her claim, it reviewed the evidence it considered including Dr. Dillon's report, describing it in virtually the same way as it is described in the ERISA appeal summary, *supra.*  AR at 9-11.

In light of the above documentation in the administrative record, it is clear that AIG considered Dr. Dillon's report when it reviewed Ms. Alstork's appeal of its denial of her claim. Therefore, Ms. Alstork's argument that AIG's decision was arbitrary and capricious because it failed to consider Dr. Dillon's report is not supported by the record.

The Court turns to the question of whether, in light of the evidence before AIG, as well as the fact that it was possibly a conflicted decision maker, AIG's decision denying Ms. Alstork's claim was arbitrary and capricious.

While an ERISA plan administrator may not arbitrarily refuse to consider the opinion of a claimant's treating physician, the administrator is not required to accord special weight to the treating physician's opinion.  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003); *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 293 (6th Cir. 2005)("treating physician rule" does not apply in the ERISA context).  Under the arbitrary and capricious standard, an administrator is free to disagree with the conclusions of the claimant's treating physician and instead prefer the opinions of reviewing doctors who have never examined the claimant so long as those opinions are reasonable and based on the evidence.  *Harris v. Kemper Ins. Companies,* 360 F.Supp.2d 844, 849 (E.D. Mich.

2005); accord, *Calvert,* 409 F.3d at 293-94.

Where accidental death benefits are limited to injuries that are the direct result of an accident and which must be independent of all other causes, an administrator's denial of benefits is proper where the decedent had a pre-existing medical condition that contributed to the decedent's death. *Anderson-Tully Co. v. Pan American Life Ins Co.,* No. 96-5348, 1997 WL 359079 at *2, 116 F.3d 1480 (table)(6th Cir. June 26, 1997)(decedent accidently fell out of hospital bed and subsequently died but the cause of his death was not injuries he sustained in the fall; rather, he died indirectly as result of surgical treatment for disease of the body); *Criss v. Hartford Accident & Indem. Co.*, No. 91 2092, 1992 WL 113370 at *6, 963 F.2d 373 (table)(6th Cir. May 28, 1992)(death occurred from a combination of the underlying heart disease and injuries sustained in an automobile collision); see also, *Corum v. Hartford Life and Accident Ins. Co.*, ___ F.Supp.2d ___, 2008 WL 817092 at *5 (E.D. Ky. 2008), citing *Criss, supra.*

As noted above, the administrative record makes it clear that AIG considered the report which Dr. Dillon, Mr. Roberts' treating cardiologist provided in support of Ms. Alstork's appeal. However, as the above cited authority makes clear, AIG was not required to give Dr. Dillon's report any special weight. Indeed, AIG was free to disagree with Dr. Dillon's conclusions and instead rely on the opinions of Drs. Harshbarger and Carter so long as their opinions were reasonable and based on the evidence.

Dr. Harshbarger, the coroner who performed the post-mortem examination of Mr. Roberts, specifically noted that Mr. Roberts exhibited, at worst, contusions and abrasions, a fracture of his left femur, and 100 ml. of blood in his abdomen. In other words, Dr. Harshbarger noted the general absence of serious traumatic injuries. Further, in addition to noting the surgical therapy for

14

Mr. Robert's congenital heart disease, Dr. Harshbarger documented the presence of heart disease which was reflected by cardiomegaly with a heart weight of 420 grams and a hypertrophied right ventricle cardiomegaly.

In addition to Dr. Harshbarger's findings, AIG relied on Dr. Carter's conclusions. Dr. Carter reviewed the entire claim file including, *inter alia,* the police report, Dr. Harshbarger's autopsy findings, and Mr. Robert's death certificate. Dr. Carter noted that the police officer who witnessed the accident saw Mr. Roberts' vehicle leave the westbound traffic lane of the roadway before it collided with a utility pole on the eastbound side of the road. Dr. Carter determined that the officer's observation indicated that there was something wrong prior to the impact. Dr. Carter also noted that Dr. Harshbarger's examination revealed that Mr. Roberts sustained minimal trauma-related injuries as a result of the collision. Finally, Dr. Carter noted that both Dr. Harshbarger and the death certificate identified the cause of Mr. Roberts' death as cardiac arrhythmia due to congenital heart disease with blunt force injuries contributing to his death.

There is uncontradicted evidence that Mr. Roberts suffered from heart disease. Although Dr. Dillon opined that Mr. Roberts "had been extremely stable for many years and had not shown any evidence for deterioration or a serious rhythm disturbance", Dr. Dillon provided no evidence which challenges Dr. Harshbarger's findings. Stated differently, Dr. Dillon, who simply provided a review of Mr. Roberts' medical history did not provide an opinion to rebut Dr. Harshbarger's direct observations which he made during the post-mortem examination.

Ms. Alstork relies a great deal on Dr. Harshbarger's description of the manner of Mr. Roberts' death as "accidental". However, Dr. Harshbarger's broad use of the term "accidental" in describing the *manner* of Mr. Roberts' death does not change his conclusion that the *cause* of death

15

was cardiac arrhythmia due to congenital heart disease. In other words, while Mr. Roberts may have accidently crashed into the utility pole, the cause of that accident was, based on Drs. Harshbarger's and Carter's conclusions, Mr. Robert's heart disease.

The fact that AIG is potentially a conflicted administrator does not change this Court's analysis. The undisputed facts contained in the coroner's autopsy report, coupled with Dr. Carter's conclusions which were based on her review of the entire file, permitted AIG to reasonably come to the conclusion that Mr. Robert's death was not solely caused by the collision with the utility pole.

Under these facts, this Court finds that AIG's decision that Mr. Roberts did not die as a the result of bodily injury caused by an accident and which resulted directly and independently of all other causes was not arbitrary and capricious.

Plaintiff's Motion for Judgment on the Administrative Record, (Doc. 16), is denied. Defendant's Motion for Judgment on the Administrative Record, (Doc. 17), is granted.   The Clerk

shall enter judgment in favor of Defendant and against Plaintiff, affirming the decision of the administrator.

July 14, 2008.

                                                                 s/ **Michael R. Merz**
                                                      Chief United States Magistrate Judge

H:\DOCS\Alstork v. AIG Decision on Merits.wpd